UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

TERRANCE EUGENE SIMMONS,

                Plaintiff,

v.

UNKNOWN NOVAK, et al.,

                Defendants.

_____/

Case No. 1:24-cv-596

Honorable Phillip J. Green

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis* in a separate order. Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, Plaintiff consented to proceed in all matters in this action under the jurisdiction of a United States magistrate judge. (ECF No. 1, PageID.4.)

This case is presently before the Court for preliminary review under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court is required to conduct this initial review prior to the service of the complaint. *See In re Prison Litig. Reform Act*, 105 F.3d 1131, 1131, 1134 (6th Cir. 1997); *McGore v. Wrigglesworth*, 114 F.3d 601, 604–05 (6th Cir. 1997). Service of the complaint on the named defendants is of particular significance in defining a putative defendant's relationship to the proceedings.

"An individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process." *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347 (1999). "Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Id.* at 350. "[O]ne becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend." *Id.* (citations omitted). That is, "[u]nless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Id.* at 351. Therefore, the PLRA, by requiring courts to review and even resolve a plaintiff's claims before service, creates a circumstance where there may only be one party to the proceeding—the plaintiff—at the district court level and on appeal. *See, e.g.*, *Conway v. Fayette Cnty. Gov't*, 212 F. App'x 418 (6th Cir. 2007) ("Pursuant to 28 U.S.C. § 1915A, the district court screened the complaint and dismissed it without prejudice before service was made upon any of the defendants . . . [such that] . . . only [the plaintiff] [wa]s a party to this appeal.").

Here, Plaintiff has consented to a United States magistrate judge conducting all proceedings in this case under 28 U.S.C. § 636(c). That statute provides that "[u]pon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings . . . and order the entry of judgment in the case . . . ."

2

28 U.S.C. § 636(c). Because the named Defendants have not yet been served, the undersigned concludes that Defendants are not presently parties whose consent is required to permit the undersigned to conduct a preliminary review under the PLRA, in the same way they are not parties who will be served with or given notice of this opinion. *See Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995) ("The record does not contain a consent from the defendants[; h]owever, because they had not been served, they were not parties to th[e] action at the time the magistrate entered judgment.").[1]

Under the PLRA, the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

---

[1] *But see Coleman v. Lab. & Indus. Rev. Comm'n of Wis.*, 860 F.3d 461, 471 (7th Cir. 2017) (concluding that, when determining which parties are required to consent to proceed before a United States magistrate judge under 28 U.S.C. § 636(c), "context matters" and the context the United States Supreme Court considered in *Murphy Bros.* was nothing like the context of a screening dismissal pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c)); *Williams v. King*, 875 F.3d 500, 503–04 (9th Cir. 2017) (relying on Black's Law Dictionary for the definition of "parties" and not addressing *Murphy Bros.*); *Burton v. Schamp*, 25 F.4th 198, 207 n.26 (3d Cir. 2022) (premising its discussion of "the term 'parties' solely in relation to its meaning in Section 636(c)(1), and . . . not tak[ing] an opinion on the meaning of 'parties' in other contexts").

## Discussion

### I.    Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the St. Louis Correctional Facility (SLF) in St. Louis, Gratiot County, Michigan.  The events about which he complains, however, occurred at the Bellamy Creek Correctional Facility (IBC) in Ionia, Ionia County, Michigan.  Plaintiff sues MDOC Director Heidi Washington and the following IBC personnel: Inspectors Unknown Harris and Unknown Addis; Hearings Investigator Unknown Novak; Lieutenants Unknown Sissel and Unknown Rowland; Sergeants Unknown Teelander and Unknown Hall; Prison Counselor Unknown Lam; Residential Unit Manager Unknown Buchin; Qualified Mental Health Professional Unknown Hickey; and Grievance Coordinator Unknown Brooke.

In Plaintiff's complaint, he alleges that on February 5, 2024, Plaintiff told Defendant Teelander that he needed "protection from two separate groups," explaining: "one, I'm not a gangbanger, two, my saf[e]ty was in danger, three, I had nowhere els[e] to go . . . ." (Grievance, ECF No. 1-6, PageID.28;[2] *see also* Compl., ECF

---

[2] The Court may consider documents that are attached to a *pro se* complaint when considering whether the complaint states a claim upon which relief should be granted. *See, e.g.*, *Powell v. Messary*, 11 F. App'x 389, 390 (6th Cir. 2001) (affirming the Eastern District of Michigan District Court's consideration of the attachments to plaintiff's complaint to determine that the plaintiff had received medical treatment and, therefore, failed to state a claim under the Eighth Amendment); *Hardy v. Sizer*, No. 16-1979, 2018 WL 3244002 (6th Cir. May 23, 2018) (affirming this Court's consideration of the plaintiff's complaint allegations and the documents attached to the complaint to support the determination that the plaintiff failed to state a claim); *Hogan v. Lucas*, No. 20-4260, 2022 WL 2118213, at *3 n.2 (6th Cir. May 20, 2022) (stating that "[b]ecause the documents attached to Hogan's complaint are referenced

No. 1, PageID.8.)  Teelander told Plaintiff that he did not need protective custody. On February 8, 2024, Plaintiff filed a grievance against Defendant Teelander.

On February 26, 2024, Defendant Hall reviewed Plaintiff's grievance against Teelander.  Hall told Plaintiff that if he signed off on the grievance, Plaintiff would "have [Hall's] protection, no one will do anything to [Plaintiff] and [Hall] would guarantee [Plaintiff would] get a parole."  (Compl., ECF No. 1, PageID.8.)  Plaintiff reports that Hall even said he would speak on Plaintiff's behalf.  (*Id.*)

Plaintiff alleges that he was written a misconduct for fighting on March 9, 2024.  (Misconduct Report, ECF No. 1-1, PageID.16.)  Pending the hearing on the misconduct report, Plaintiff was placed in temporary segregation.  After the hearing, on March 18, 2024, the misconduct was dismissed because the report named the wrong prisoner with whom Plaintiff was fighting.

Plaintiff asked Defendant Novak if Plaintiff could be released from segregation.  Novak told Plaintiff he would not be released because Novak was rewriting the misconduct report to name the correct "other prisoner."  On March 18, 2024, Plaintiff asked Novak if he could receive his Quran in segregation.  Plaintiff does not report how Novak responded.

That same day, Plaintiff spoke with Defendant Sissel.  It is not clear from Plaintiff's allegations whether Plaintiff spoke about the refusal to release Plaintiff from segregation, the fact that Plaintiff did not have his Quran, or both.  Sissel told

---

in the complaint and 'central to the claims contained therein,' they were properly considered at the § 1915(e)(2) screening stage." (citations omitted)).

Plaintiff that "they can't do that," but he also said he could not help Plaintiff.  (Compl.,
ECF No. 1, PageID.7.)  Plaintiff asked Sissel for Plaintiff's Quran.  Plaintiff does not
report how Sissel responded.

On March 20, 2024, Plaintiff informed Defendant Lam and Defendant Buchin
that he was not being allowed to leave segregation even though the misconduct had
been dismissed.  Buchin told Plaintiff that Buchin had "nothing to do with that."  (*Id.*)
Plaintiff reports that Buchin was the person who rewrote the misconduct to name the
correct "other prisoner."  (Misconduct Report, ECF No. 1-1, PageID.17.)  Plaintiff told
Defendant Buchin that he was still in need of his religious items.  Plaintiff does not
report how Buchin responded.

Plaintiff claims that Defendant Lam stopped by every day, but did not assist
Plaintiff in securing release from segregation.  Plaintiff also notes that Lam did "not
assist [Plaintiff] . . . [in] obtain[ing] his religious items."  (Compl., ECF No. 1,
PageID.7.)  Plaintiff does not say if he ever asked Lam to help or, if Plaintiff did ask,
he does not say how Lam responded.

On March 21, 2024, Plaintiff saw Defendant Hickey.  Plaintiff does not state
what he said to Hickey, only that she did not allow Plaintiff to explain something.
Instead, she told Plaintiff that she "can't do anything . . . ."  (*Id.*)  Again, it is not clear
whether Hickey was referring to Plaintiff's continued stay in temporary segregation
or Plaintiff's lack of his religious property.  However, it is clear that Plaintiff's needs
were addressed that day.  Defendant Hickey drafted an explanation why Plaintiff
could not be assigned to the START program, (ECF No. 1-2, PageID.19), and,

apparently, Plaintiff received his religious property because he identifies the period he was without his religious property as ending on March 21, 2024, (Compl., ECF No. 1, PageID.8).

That same day, Plaintiff explained the situation to Defendant Teelander, who did nothing.

That day, Plaintiff also started the grievance process, submitting a grievance to Defendant Brooke.  Plaintiff also sent kites to Defendants Addis and Harris, but they ignored the kites.  (Handwritten Kites, ECF No. 1-4, PageID.24–25.)

On April 3, 2024, the officer hearing the rewritten misconduct dismissed the charge as untimely because Plaintiff had been left in segregation too long pending the hearing.  (Misconduct Hr'g Report, ECF No. 1-7, PageID.27.)

On April 25, 2024, Plaintiff was involved in a fight on the yard.  (Misconduct Report, ECF No. 1-7, PageID.32.)   An investigation revealed that Plaintiff was assaulted and did not fight back.  (Request for Protection/Investigation Report, ECF No. 1-7, PageID.31.)   The next day, two members of the Security Classification Committee, including Defendant Buchin, recommended that Plaintiff be transferred to an alternate Level IV facility to meet Plaintiff's protection needs.  (*Id*.)

Plaintiff seeks injunctive relief related to his religious property, as well as compensatory and punitive damages against all Defendants except Defendant Washington.

## II.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.    Although  the  plausibility  standard  is  not  equivalent  to  a  "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded  facts  do  not  permit  the  court  to  infer  more  than  the  mere  possibility  of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."  *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly*/*Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a  right  secured  by  the  federal  Constitution  or  laws  and  must  show  that  the deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).

Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Plaintiff claims that Defendant Novak violated the Americans with Disabilities Act (ADA), codified at 42 U.S.C. § 12101 *et seq.*, and the Religious Land Use and Institutionalized Persons Act (RLUIPA), codified at 42 U.S.C. § 2000cc et seq., when Novak left Plaintiff in segregation after the dismissal of the misconduct "while den[y]ing [Plaintiff] the services and programs provided by [the] ADA and RLUIPA." (Compl., ECF No. 1, PageID.11, ¶ 16.) Plaintiff also contends that Defendants Novak, Sissel, Lamb Buchin, Hickey, and Teelander denied Plaintiff his religious items in violation of RLUIPA. (*Id.* ¶ 17.) Additionally, Plaintiff alleges that Defendants Teelander and Hall violated Plaintiff's Eighth Amendment right to protection from harm when they ignored Plaintiff's requests for protection. (*Id.*, PageID.12, ¶ 18.) Finally, without setting forth any specific claims, Plaintiff references bringing claims under the First and Fourteenth Amendments. (*See id.*, PageID.5.)

## A.    RLUIPA

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to [a prison] . . . unless the government demonstrates that imposition of the burden on that person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a); *see also Haight v. Thompson*, 763 F.3d 554, 559–60 (6th Cir. 2014).

RLUIPA creates a burden-shifting framework for assessing prisoner claims. A prisoner bears the initial burden to show (1) his desired religious exercise is motivated by a "sincerely held religious belief" and (2) the government is substantially burdening that religious exercise. *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019); *see also Ackerman v. Washington*, 16 F.4th 170, 179 (6th Cir. 2021) (citation omitted). "If the prisoner successfully shows the state substantially burdens a sincere religious belief, the burden shifts to the government to justify the burden on the religious adherent under the 'daunting compelling interest and least-restrictive-means test,' with a slight twist." *Ackerman*, 16 F.4th at 179 (quoting *Cavin*, 927 F.3d at 458). Courts must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005).

However, RLUIPA does not create a cause of action against an individual in that individual's personal capacity. *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 331 (5th Cir. 2009), *aff'd, Sossamon v. Texas*, 563 U.S. 277 (2011);[3] *see also Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012) ("[RLUIPA] does not create a

---

[3] The Supreme Court granted certiorari only on the question "Whether an individual may sue a State or state official in his official capacity for damages for violation of" RLUIPA. *Sossamon v. Texas*, 560 U.S. 923 (2010). Thus, the Supreme Court left undistrubed and unreviewed the Fifth Circuit's holding that "RLUIPA does not create a cause of action against defendants in their individual capacities." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 331 (5th Cir. 2009).

cause of action against state employees in their personal capacity."); *Washington v. Gonyea*, 731 F.3d 143, 145 (2d Cir. 2013) ("RLUIPA does not provide a cause of action against state officials in their individual capacities . . . .").[4]  Therefore, Plaintiff's RLUIPA claims for damages, declaratory, or injunctive relief against Defendants in their respective personal capacities are properly dismissed.

Plaintiff brings claims against all Defendants in their respective official capacities as well.  Official-capacity lawsuits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55 (1978)).  An official-capacity suit is to be treated as a suit against the entity itself. *Id.* at 166 (citing *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985)); s*ee also Matthew v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).  "Individuals sued in their official capacities stand in the shoes of the entity they represent," and the suit is not against the official personally. *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003); *Graham*, 473 U.S. at 165-66.  Thus, a suit against an individual in his or her official capacity is equivalent to a suit brought against the governmental entity,

---

[4] In *Haight v. Thompson*, 763 F.3d 554 (6th Cir. 2014), the Sixth Circuit analyzed whether Congress's spending power permitted a RLUIPA damages claim against an individual prison official in the official's personal capacity. The court rested its determination that such claims were not permitted on its conclusion that "appropriate relief" under RLUIPA was not a sufficiently clear statement to authorize such a damages claim. *Id.* at 567–69. The court stopped short of adopting the reasoning that swayed the Fifth Circuit in *Sossamon* and subsequent federal circuit court panels. *Haight*, however, did not squarely present the issue whether a personal capacity suit for injunctive or declaratory relief might be available.

in this case, the MDOC.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).

Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1994).  Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to, for example, civil rights suits in federal court.  *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986).  In numerous opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from a § 1983 suit under the Eleventh Amendment.  *See*, *e.g.*, *Harrison v. Michigan*, 722 F.3d 768, 771 (6th Cir. 2013); *McCoy v. Michigan*, 369 F. App'x 646, 653–54 (6th Cir. 2010).

In *Sossamon*, the Supreme Court held that the RLUIPA did not abrogate sovereign immunity under the Eleventh Amendment.  563 U.S. 277; *see also Cardinal v. Metrish*, 564 F.3d 794, 801 (6th Cir. 2009) ("[T]he Eleventh Amendment bars plaintiff's claim for monetary relief under RLUIPA.").  Therefore, although the statute permits the recovery of "appropriate relief against a government," 42 U.S.C. § 2000cc-2(a), monetary damages are not available under RLUIPA.

An official capacity action seeking injunctive or declaratory relief constitutes an exception to sovereign immunity.  *See Ex Parte Young*, 209 U.S. 123, 159–60 (1908) (holding that the Eleventh Amendment immunity does not bar prospective injunctive relief against a state official).  The United States Supreme Court has determined that a suit under *Ex parte Young* for prospective injunctive relief should not be treated as an action against the state.  *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985). Instead, the doctrine is a fiction recognizing that unconstitutional acts cannot have been authorized by the state and therefore cannot be considered done under the state's authority.  *Id.*

Thus, under *Ex parte Young*, 209 U.S. 123, 155–56 (1908), a plaintiff can sue state officers to enjoin an unconstitutional state policy.  "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."  *Will v.*, 491 U.S. at 71.  When challenging a state policy, the officer sued must "have some connection" with the policy's enforcement or execution.  *Ex parte Young*, 209 U.S. at 157.  Even when a function is administered on a day-to-day level by local officials, a state officer's supervisory authority can still make her a proper defendant under *Ex parte Young. See, e.g.*, *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048–49 (6th Cir. 2015).  So long as the named defendants are "actively involved" with the challenged conduct, they can be sued for injunctive relief without implicating the Eleventh Amendment.  *Id.*; *accord Doe v. DeWine*, 910 F.3d 842, 848–49 (6th Cir. 2018).

Nonetheless, the Supreme Court has cautioned that, "*Ex parte Young* can only be used to avoid a state's sovereign immunity when a 'complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Ladd v. Marchbanks*, 971 F.3d 574, 581 (6th Cir. 2020) (quoting *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).  Past exposure to an isolated incident of illegal conduct does not, in itself, sufficiently prove that the plaintiff will be subjected to the illegal conduct again.  *See, e.g.*, *Los Angeles v. Lyons*, 461 U.S. 95 (1983) (addressing injunctive relief); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (addressing declaratory relief).

Moreover, the Sixth Circuit has held that transfer to another correctional facility moots a prisoner's injunctive and declaratory claims.  *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996) (holding that a prisoner-plaintiff's claims for injunctive and declaratory relief became moot when the prisoner was transferred from the prison about which he complained); *Mowatt v. Brown*, No. 89-1955, 1990 WL 59896 (6th Cir. May 9, 1990); *Tate v. Brown*, No. 89-1944, 1990 WL 58403 (6th Cir. May 3, 1990); *Williams v. Ellington*, 936 F.2d 881 (6th Cir. 1991).  Here, Plaintiff is no longer confined at IBC, which is where he avers that Defendants—with the exception of Defendant Washington—are employed.  And Plaintiff's request for injunctive and declaratory relief does not relate to an ongoing violation and, thus, is not prospective.  For that reason, he cannot maintain his claims for injunctive or declaratory relief against the IBC Defendants in their official capacity.  Plaintiff has likewise failed to

allege any ongoing violation committed by Defendant Washington.  Thus, he also fails to state a RLUIPA claim against Defendant Washington in her official capacity.

Moreover, even if Plaintiff could find a Defendant subject to suit under RLUIPA, he has failed to state a claim for violation of the statute because he has failed to allege facts that support an inference that the government substantially burdened Plaintiff's religious exercise.  Plaintiff describes a three-day window, beginning March 18, 2024, where he asked one or more of the Defendants about his religious items.  He acknowledges that he had access to his religious items by March 21, 2024.  There is no indication that any Defendant refused Plaintiff or advised Plaintiff that he could not have the items.  Certainly, being without religious items could burden a prisoner's free exercise of his religious practices; but the time involved here is simply too short for that exercise to be *substantially* burdened.  *See, e.g.*, *Marsh v. Corr. Corp. of America*, No. 97-2070, 1998 WL 31435, at *3 (10th Cir. Jan. 28, 1998) (stating that "plaintiff's allegations that defendants temporarily deprived her of religious items during the fifteen days she was confined to disciplinary segregation failed to satisfy her burden of establishing a First Amendment violation"); *Hardy v. Lott*, 3:19-CV-956-JD-MGG, 2020 WL 6826498, at *2 (N.D. Ind. Nov. 20, 2020) (concluding that one week in segregation without a Bible "was too short to constitute a First Amendment violation"); *Moler v. Stovall*, No. 6:19-203-GFVT, 2019 WL 6467820, at *2 (E.D. Ky. Dec. 2, 2019) (holding that prisoner failed to state an RLUIPA claim because the three-week deprivation of a Bible while in SHU was not a substantial burden); *Brown v. Adams*, No. 2:13-CV-192-RMP, 2015 WL

867657, at *6 (E.D. Wash. Feb. 27, 2015) (concluding that denying prisoner access to religious books for eight days, and only four days after he requested them, was not a substantial burden); *McCroy v. Douglas Cnty. Corr. Cntr.*, No. 8:10CV-69, 2010 WL 1610945, at *3 (D. Neb. Apr. 20, 2010), *aff'd* 394 F. App'x 325 (8th Cir. 2010) (concluding fifteen-day deprivation of religious items was not a substantial enough deprivation to state a claim).[5]  Accordingly, Plaintiff has failed to state a claim for violation of RLUIPA.

---

[5] Although some of the cited decisions are based on the First Amendment Free Exercise Clause rather than RLUIPA, the reasoning in all of the decisions relates to the "substantial burden" requirement, which is common to both claims. The phrase "substantial burden" is not defined in RLUIPA. The Sixth Circuit Court of Appeals has relied upon the Act's legislative history to conclude that the term has the same meaning under RLUIPA as provided by the Supreme Court in its "free exercise" decisions. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 733–34 (6th Cir. 2007). Accordingly, a burden is substantial where it forces an individual to choose between the tenets of his religion and foregoing governmental benefits or places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* (citations omitted); *Cutter*, 544 U.S. at 720 (recognizing that RLUIPA's institutionalized persons provision was intended to alleviate only "exceptional" burdens on religious exercise); *Marshall v. Frank*, 2007 WL 1556872, at *5 (W.D. Wis. May 24, 2007) (discussing that a substantial burden is one which renders religious exercise "effectively impracticable" (quoting *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003))). A burden is less than "substantial" where it imposes merely an "inconvenience on religious exercise," *see, e.g.*, *Konikov v. Orange County, Florida*, 410 F.3d 1317, 1323 (11th Cir. 2005), or does not "pressure the individual to violate his or her religious beliefs." *Living Water*, 258 F. App'x at 734. Such conclusions recognize that RLUIPA was not intended to create a cause of action in response to every decision which serves to inhibit or constrain religious exercise, as such would render meaningless the word "substantial." *See Civil Liberties for Urban Believers*, 342 F.3d at 761. Thus, under the First Amendment or RLUIPA, Plaintiff must allege that his religious exercise has been substantially burdened.

**B.    ADA**

Plaintiff reports that Defendant Novak left Plaintiff in segregation after the initial misconduct report was dismissed.  Plaintiff claims that leaving Plaintiff in segregation was a violation of the ADA.

The ADA "prohibit[s] public or federally funded entities, including prisons, from discriminating against disabled individuals while operating services or programs." *Finley v. Huss*, 102 F.4th 789, 819–20 (6th Cir. 2024) (internal citations omitted).  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Therefore, to state a claim under the ADA, a plaintiff must show that he is a "qualified person," that he has a "disability," and that he has been denied a "service, program, or activity" of the state or subjected to discrimination.

The Supreme Court has held that Title II of the ADA applies to state prisons and inmates, *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210–12 (1998).  The proper defendant for Title II ADA claims is the public entity or an official acting in his official capacity.  *Carten v. Kent State Univ.*, 282 F.3d 391, 396–97 (6th Cir. 2002); *see, e.g.*, *Tanney v. Boles*, 400 F. Supp. 2d 1027, 1044 (E.D. Mich. 2005) (citations omitted).  Plaintiff sues Defendant Novak in his official and individual capacities.  Because Plaintiff may not pursue any ADA claims against Defendant Novak in his individual capacity, any intended ADA claim against Defendant Novak in his individual capacity will be dismissed.

17

As to Plaintiff's official capacity ADA claim, the State of Michigan (acting through the MDOC) is not necessarily immune from Plaintiff's claims under the ADA. *See, e.g.*, *Tanney v. Boles*, 400 F. Supp. 2d 1027, 1044–47 (E.D. Mich. 2005). At this stage of the proceedings, the Court assumes, without deciding, that Defendant Novak is not immune from liability in his official capacity under the ADA. *See, e.g.*, *Tanney*, 400 F. Supp. 2d at 1047 (citing cases).

Turning to the merits of Plaintiff's ADA claim, in this action, Plaintiff states in a conclusory fashion that he is "mentally impaired." (ECF No. 1, PageID.6.) Even assuming that Plaintiff's mental health condition—whatever that may be—falls within the definition of "disability," Plaintiff's allegations do not show that he was excluded from a service or program, denied accommodation, or discriminated against *due to his disability*. Plaintiff never actually states that Defendant Novak discriminated against him. Plaintiff's conclusory allegation of ADA violation without specific supporting factual allegations fail to state a claim. *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555. For that reason alone, Plaintiff's ADA claim will be dismissed.

Moreover, considering paragraph 16 of the complaint together with attachment #2 to the complaint, (ECF No. 1-2, PageID.19), it is apparent that the focus of Plaintiff's ADA complaint is that Novak left Plaintiff in segregation after the initial misconduct report was dismissed because it named the wrong prisoner as Plaintiff's fight opponent. It appears that Plaintiff believes he should have been put

somewhere else.  The attachment suggests that the "somewhere else" might have been a START program.  (*Id.*)

It is the "Start Program's mission . . . [t]o provide a secure general population alternative to administrative segregation while providing programming and other structured and unstructured out of cell activities based upon the prisoner's positive adjustment, with the goal of reintegration into traditional general population." *Randall v. Washington*, No. 1:24-cv-344, 2024 WL 3158258, at *2 (W.D. Mich. June 25, 2024).  Moreover, "the target population includes prisoners with serious mental illnesses, but only if those prisoners' behavior would warrant reclassification to administrative segregation."   *Id.*   That is exactly what Defendant Hickey told Plaintiff:

> Anyone written a misconduct that lands them in temp seg, goes through the process of waiting for their misconduct hearing and receiving whatever sanctions are given. If detention is given, it applies to all prisoners regardless of SMI [serious mental illness] diagnosis. At that point, the SCC [Security Classification Committee] decides where they are going to put the prisoner. If the misconduct is the type that would typically get someone classified to Administrative Segregation for a 'laydown," then at that point they may decide alternative placement for a prisoner with an SMI diagnosis. There are a variety of options at that point, depending on what they deem is appropriate for that prisoner (some may transfer to a level 5 or an alternative level 4, some may be referred to a START program some may be released, just for some examples).

(March 21, 2024, Note, ECF No. 1-2, PageID.19.)[6]

---

[6] Defendant Hickey's explanation makes clear that not all types of segregation are the same. That is also apparent in the MDOC's policy directive regarding segregation. The Segregation Standards Policy Directive, 04.05.120 (eff. June 1, 2019), identifies three types: temporary segregation, administrative segregation, and punitive segregation. *Id.*, ¶¶ M–Z. Those same categories are used by the Federal Bureau of Prisons, *see, e.g., United States v. Price*, 84 F.4th 738, 740 n.4 (7th Cir. 2023), and

There are no facts alleged to support an inference that Plaintiff was denied access to a START program ***because*** of his serious mental illness.  Rather, he could not participate in such a program because those in temporary segregation—such as Plaintiff—are simply not eligible.  The original and the rewritten misconduct reports were dismissed.  There was no disciplinary sanction and no reclassification to administrative segregation, thus, there was no prospect for placement in the START program.  Considered in that context, Plaintiff's suggestion that he was denied the right to participate in the START program because of his mental impairment seems particularly misplaced.

For all of these reasons, Plaintiff has failed to state a claim for violation of the ADA.

### C.    Eighth Amendment Failure to Protect

Plaintiff next argues that Defendants Teelander and Hall violated Plaintiff's Eighth Amendment rights by failing to protect Plaintiff.  Inmates have a constitutionally protected right to personal safety grounded in the Eighth Amendment.  *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  Thus, prison staff are obliged "to take reasonable measures to guarantee the safety of the inmates" in their care.  *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984).  In order for a prisoner to state an Eighth Amendment claim, he must show that he faced a sufficiently serious risk

---

state jails and prisons, see Michael P. Harrington, *Methodological Challenges to the Study and Understanding of Solitary Confinement*, 79 Fed. Probation 45 (2015) (noting that "[a]dult correctional facilities rely primarily on three different types of solitary confinement[; t]hese types are commonly called temporary segregation, disciplinary segregation, and administrative segregation").

to his health or safety and that the defendant official acted with " 'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer*, 511 U.S. at 834); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993).  Deliberate indifference is a higher standard than negligence and requires that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Bishop v. Hackel*, 636 F.3d 757, 766–67 (6th Cir. 2011).

Plaintiff's allegations regarding the inaction of Defendants Teelander and Hall are as follows:

#11. Sgt. Teelander

On 2-8-24 I wrote a grievance on Sgt. Teelander's failure to protect me. This is a serious request I made when I asked to be housed in protective custody. Sgt. Teelander stated "A guy like you doesn't need protection." I explained I'm being targeted and just want to go home. Sgt. Teelander stated "You don't need no fucking protecting" on 2-5-2024.

#12. Sgt. Hall

On 2-26-24 I had a review for my grievance on Sgt. Teelander. While being reviewed Sgt. Hall took advantage of my mental disability with false promises. Sgt. Hall stated "If you sign off you'll have my protection. No one will do anything to you and I can guarantee you will get a parole. I'll even speak on your behalf." I believed him.

(Compl., ECF No. 1, PageID.8.)[7]

---

[7] Some of Plaintiff's spelling and grammatical errors have been corrected for readability.

Plaintiff's allegations shed no light on the facts he told Defendant Teelander or Defendant Hall to show that Plaintiff was subject to a substantial risk of serious harm.  Nor do Plaintiff's allegations show that Defendants were, in fact, aware that Plaintiff was subject to a substantial risk of serious harm, much less that they disregarded that risk.  The March 9, 2024, fight does not support the conclusion that Plaintiff was subject to a substantial risk of serious harm.  To the contrary, Plaintiff does not dispute that he intervened in a fight that Prisoner Cromer started with Prisoner Robinson.  (Misconduct Report, ECF No. 1-1, PageID.17.)  The first indication of a threat to Plaintiff occurred almost three months after Plaintiff told Defendant Teelander that Plaintiff was in danger, when Prisoner Snadon assaulted Plaintiff.  (Request for Protection, ECF No. 1-7, PageID.31–32.)  Based on Plaintiff's scant allegations, the Court concludes that Plaintiff has failed to allege sufficient facts to support the subjective prong of his Eighth Amendment claim.  Plaintiff's conclusory allegations that these Defendants violated his constitutional rights without specific factual allegations regarding their knowledge of a substantial risk of serious harm and their disregard of that risk fail to state a claim under § 1983. *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555.

### D.    Other Claims

While *pro se* pleadings are to be liberally construed, "this court is not required to conjure up unpled allegations." *Dietz v. Sanders*, 100 F. App'x 334, 338 (6th Cir. 2004).  The Court is particularly reluctant to add potential unstated claims where Plaintiff has so carefully delineated his claims in the complaint.  (*See* ECF No. 1, PageID.11–12.)  Yet, in the first paragraph of his complaint, Plaintiff states that he

"brings these claims under the [ADA] and U.S. Const. Amends 1st and 14th, respectively, and RLUIPA . . . ." (Compl., ECF No. 1, PageID.5.)  Plaintiff does not mention those constitutional claims anywhere else in the complaint.  Nonetheless, the Court will consider whether Plaintiff has stated claims under the Due Process Clause of the Fourteenth Amendment, the Petition Clause of the First Amendment, and the Free Exercise Clause of the First Amendment.

## 1.    Due Process

Plaintiff mentions due process in the attachments to his complaint.  It is possible that Plaintiff might have raised due process claims relating to the handling of his grievance against Defendant Teelander or the handling of the misconduct reports that kept him in temporary segregation.  Neither claim would have any merit.

Plaintiff has no due process right to file a prison grievance.  The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure.  *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569–70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases).  Michigan law does not create a liberty interest in the grievance procedure.  *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994).  Because Plaintiff

has no liberty interest in the grievance process, no Defendant could deprive him of due process by interfering with the grievance remedy.

With regard to the disciplinary proceedings, the Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause. According to that Court, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 486–87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir. 1995). The sanctions available in the MDOC disciplinary scheme do not impose atypical or significant hardships nor do they affect the duration of an inmate's sentence.

## 2.    First Amendment Retaliation

Plaintiff notes that Defendant Hickey, when she declined to help Plaintiff with obtaining his religious items or his placement, mentioned that Plaintiff had written a grievance against her. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of

ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The filing of a nonfrivolous prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). The right to file grievances is protected only insofar as the grievances are not "frivolous." *Herron*, 203 F.3d at 415. "Abusive or manipulative use of a grievance system would not be protected conduct," *King v. Zamiara*, 680 F.3d 686, 699 (6th Cir. 2012), and an "inmate cannot immunize himself from adverse administrative action by prison officials merely by filing a grievance or a lawsuit and then claiming that everything that happens to him is retaliatory," *Spies v. Voinovich*, 48 F. App'x 520, 525 (6th Cir. 2002). As the Supreme Court held in *Lewis v. Casey*, 518 U.S. 343 (1996), "[d]epriving someone of a frivolous claim . . . deprives him of nothing at all, except perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions." *Id.* at 353 n.3. Plaintiff fails to allege any facts to support an inference regarding the nature of Plaintiff's grievance against Defendant Hickey.

But even if Plaintiff's grievance were nonfrivolous, Plaintiff's claim falls short at the second step. Plaintiff suggests two possible "adverse actions:" not providing

Plaintiff's religious items and not moving Plaintiff to the START program. But the very day he talked to Defendant Hickey, he finally received the religious items as well as an explanation regarding his ineligibility for the START program. The Court cannot infer that Hickey's response would have deterred a person of ordinary firmness from filing grievances. Plaintiff does not allege that he was deterred and he filed a grievance and complained in kites that very day. Based on Plaintiff's allegations, he has failed to identify an adverse action that Hickey took against him on March 21, 2024, or that the actions she took were motivated by Plaintiff's prior grievance against her. Accordingly, the Court concludes that Plaintiff has failed to state a First Amendment retaliation claim.

### 3.    Free Exercise of Religion

Plaintiff's religious claim is plainly grounded in RLUIPA and there are no references to the Free Exercise Clause in the complaint. Nonetheless, because those two claims are typically raised together, the Court will consider whether Plaintiff has stated a free exercise claim.

The First Amendment provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend I. The right to freely exercise one's religion falls within the fundamental concept of liberty under the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). Accordingly, state legislatures and those acting on behalf of a state are "as incompetent as Congress" to interfere with the right. *Id.* While "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates retain the First Amendment protection to freely exercise their

religion. *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). To establish that this right has been violated, Plaintiff must establish that: (1) the belief or practice he seeks to protect is religious within his own "scheme of things," (2) that his belief is sincerely held, and (3) Defendants' behavior infringes upon this practice or belief. *Kent v. Johnson*, 821 F.2d 1220, 1224–25 (6th Cir. 1987).

At this stage of the proceedings, the Court assumes, without deciding, that Plaintiff has sufficiently alleged his sincerely held religious beliefs, and there is no doubt that reading the Quran and praying on a prayer rug are religious practices. The next consideration is "whether the challenged practice of the prison officials infringes on the religious belief." *Kent*, 821 F.2d at 1224–25. A practice will not be considered to infringe on a prisoner's free exercise unless it "places[s] a substantial burden on the observation of a central religious belief or practice." *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989). A burden is substantial where it forces an individual to choose between the tenets of his religion and foregoing governmental benefits or places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Living Water*, 258 F. App'x at 734 (citations omitted).

As explained above, Plaintiff describes a three-day window, beginning March 18, 2024, where he asked one or more of the Defendants about his religious items. He acknowledges that he had access to his religious items by March 21, 2024. There is no indication that any Defendant refused Plaintiff or advised Plaintiff that he could not have the items. Certainly, being without religious items could burden a prisoner's free exercise of his religious practices; but the time involved here is simply too short

27

for that exercise to be *substantially* burdened.  *See, e.g.*, *Marsh*, 1998 WL 31435, at

*3 (stating that "plaintiff's allegations that defendants temporarily deprived her of

religious items during the fifteen days she was confined to disciplinary segregation

failed to satisfy her burden of establishing a First Amendment violation"); *Hardy*,

2020 WL 6826498, at *2 (concluding that one week in segregation without a Bible

"was too short to constitute a First Amendment violation"); *Moler*, 2019 WL 6467820,

at *2 (holding that prisoner failed to state an RLUIPA claim because the three-week

deprivation of a Bible while in SHU was not a substantial burden); *Brown*, 2015 WL

867657, at *6 ( (concluding that denying prisoner access to religious books for eight

days, and only four days after he requested them, was not a substantial burden);

*McCroy*, 2010 WL 1610945, at *3 (D. Neb. Apr. 20, 2010), *aff'd* 394 F. App'x 325 (8th

Cir. 2010) (concluding fifteen-day deprivation of religious items was not a substantial

enough deprivation to state a claim).  Because Plaintiff has failed to allege that

Defendants imposed a substantial burden on Plaintiff's religious practice, he has

failed to state a claim for violation of his free exercise rights.

## Conclusion

Having conducted the review required by the PLRA, the Court determines that

Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§

1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court must next decide

whether an appeal of this action would be in good faith within the meaning of 28

U.S.C. § 1915(a)(3).  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997).

Although the Court concludes that Plaintiff's claims are properly dismissed, the

Court does not conclude that any issue Plaintiff might raise on appeal would be

frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should Plaintiff appeal this decision, the Court will assess the $605.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610–11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $605.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.


Dated:  February 25, 2025                                    /s/ Phillip J. Green
                                                            PHILLIP J. GREEN
                                                            United States Magistrate Judge